IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **CATHERINE MCCALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:13-cv-00386** |
| **v.** | ) | |
| | ) | **Judge Nixon** |
| **FIRST TENNESSEE BANK NATIONAL** | ) | **Magistrate Judge Knowles** |
| **ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Pending before the Court is Defendant First Tennessee Bank National Association's

Motion for Summary Judgment ("Motion"). (Doc. No. 12.) Plaintiff Catherine McCall filed a

Response opposing Defendants' Motion (Doc. No. 17), to which Defendant filed a Reply (Doc.

No. 23), and Plaintiff filed a Sur-Reply (Doc. No. 29). For the reasons stated below, Defendant's

Motion is **GRANTED**.

I.  **BACKGROUND**

    *A. Factual History*[1]

Plaintiff Catherine McCall was employed by Defendant First Tennessee Bank National

Association ("FTB") at Defendant's Nissan Drive branch in Smyrna, Tennessee, from April 11,

1994, to March 19, 2013. Plaintiff was hired for the position of Teller I, after six months was

promoted to Teller II, and then subsequently promoted to Lead Teller. In each of these positions,

Plaintiff was an hourly employee and was paid 1.5 times her hourly rate for any hours worked in

excess of 40 per week.

---

[1] Unless otherwise indicated, the facts in this section are undisputed and taken from Plaintiff's Response to
Defendant's Statement of Undisputed Material Facts (Doc. No. 18) and Defendants' Response to Plaintiff's
Statement of Additional Facts (Doc. No. 24).

1

In October 2004, FTB converted all Lead Tellers, including Plaintiff, to Operations Managers, at which time FTB began paying Plaintiff a salary instead of an hourly wage. Throughout her time with FTB, Plaintiff was the only Operations Manager at the Nissan Drive branch. In 2010, Plaintiff was promoted from Operations Manager I to Operations Manager II and she remained in this position until her termination in 2013. At the time of her termination, Plaintiff was earning a base salary of $38,900.00 per year. During the statutory period for which Plaintiff seeks relief in this case—from April 25, 2010 to March 19, 2013— the tellers at the Nissan Drive branch earned between $11.09 and $13.90 per hour.

In 2005, Marcus Victory became the branch manager of the Nissan Drive branch, and was Plaintiff's direct supervisor. In August 2012, Nathan Harding replaced Victory as branch manager at the Nissan Drive branch. Harding served simultaneously as the branch manager for the Sam Ridley Parkway branch in Smyrna, where he spent the majority of his time.

During the time period at issue, the Nissan Drive branch teller windows were usually staffed with three or four employees, including Plaintiff and two or three tellers. From July 2010 to March 2011, FTB employed three full-time tellers. From March to August 2011, FTB employed two full-time tellers and one part-time teller. From August 2011 through March 2013, FTB employed two full time tellers, one of whom went on medical leave in February 2013. The Nissan Drive branch also had a financial services representative who did not work at the teller windows.

As an operations manager, Plaintiff was required to perform all of the duties of the tellers; however, at issue in this litigation is the scope of her duties beyond these basic teller responsibilities. In her role as operations manager, Plaintiff indisputably conducted interviews with potential new employees, conducted and submitted teller observations, and completed

annual teller reviews, which she and the branch manager would review with each teller individually. The branch managers also conducted observations and annual evaluations of Plaintiff. Unlike the tellers, Plaintiff's annual evaluation score was based in part on the overall performance of the tellers. Plaintiff was also eligible for quarterly bonuses based on the tellers' overall sales and customer service performance.

Plaintiff was required to attend monthly operations manager meetings in Nashville where she received information from FTB regarding policy changes and promotional goals that she was then expected to disseminate to the tellers. FTB also emailed Plaintiff and other operations managers information for Plaintiff to relay to the tellers.

As an operations manager, Plaintiff was required to participate in audits of other branches with FTB's Audit Department, in addition to audits conducted on the Nissan Drive branch. Though Plaintiff's role in preparing the tellers for audits is disputed, the parties agree that, unlike the tellers, part of Plaintiff's annual evaluation score was derived from the audit scores the branch received. Other non-teller functions Plaintiff performed included initiating the disciplinary process for tellers with excessive outages, approving the tellers' electronic time records, and performing wire transfers. Plaintiff was terminated by FTB on March 19, 2013, after she closed the drive-through window without proper authorization.

### B. Procedural History

Plaintiff filed this action against FTB on April 25, 2013, bringing claims for failure to pay overtime wages for overtime hours worked in violation of Section 207 of the Fair Labor Standards Act. (Doc. No. 1 ¶¶ 10–11.) Plaintiff also alleges FTB's violation of Section 207 was willful and in bad faith. (*Id.* ¶¶ 13.) Plaintiff requests the Court grant her backpay for the

overtime hours she was not properly compensated for as well as liquidated damages and attorney's fees pursuant to 29 U.S.C. § 216(b). (*Id.* ¶¶ 14–16.)

FTB filed its Motion for Summary Judgment January 17, 2014 (Doc. No. 12), with a Memorandum in Support (Doc. No. 13), a Statement of Undisputed Material Facts (Doc. No. 13-1), excerpts from three depositions (Doc. Nos. 13-2 to 13-4), two declarations (Doc Nos. 13-5; 13-11) and several exhibits (Doc. Nos. 13-6 to 13-10). Plaintiff filed a Response on February 24, 2014 (Doc. No. 17), with a Memorandum in Support (Doc. No. 19), a Response to Defendant's Statement of Undisputed Material Facts and Statement Additional Material Facts (Doc. No. 18), a declaration (Doc. No. 16), excerpts from the same three depositions (Doc. Nos. 17-1 to 17-4; 20) and several exhibits (Doc. Nos. 17-5 to 17-7). FTB filed a Reply on March 17, 2014 (Doc. No. 23), with a Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 24), further excerpts from the same three depositions (Doc. Nos. 25-2 to 25-4), and another declaration (Doc. No. 25-1). Plaintiff then filed a Sur-Reply (Doc. No. 29) with yet another deposition excerpt (Doc. No. 29-1).

## II.  LEGAL STANDARD

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must demonstrate that the non-moving party has failed to establish a necessary element of that party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Further, "where the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). Summary judgment will be granted if "the evidence is so one-sided

that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996). The movant has the initial burden of informing the district court of the basis of the summary judgment motion and identifying portions of the record which lack a genuine issue of material fact to support the non-movant's case. *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine issue for trial. *See id.* at 324. A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for summary judgment. *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330–31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). A dispute about a material fact is genuine if a reasonable fact finder could find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A party asserting or denying that a fact is genuinely disputed may support its position by (1) citing to particular parts of materials in the record, (2) showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or (3) showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

While the non-moving party must set forth specific facts showing there is a genuine issue for trial, all reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed. *Anderson*, 477 U.S. at 248, 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Id.* If the court determines that a reasonable fact finder could not find for the non-moving party, summary judgment must be granted. *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

## III.  ANALYSIS

The parties do not dispute the basic requirements for exemption from the overtime pay requirements of the FLSA. Under the FLSA, an employee who works "longer than forty hours" per workweek is generally required to be compensated "for his employment in excess of the [forty hours] at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1) (2012). However, employees who are "employed in a bona fide executive, administrative, or professional capacity" are not subject to these overtime requirements. *Id.* § 213(a)(1).

An employer's claim that an employee was exempt from overtime requirements under the FLSA is properly understood as an affirmative defense. *Orton v. Johnny's Lunch Franchise, LLC,* 668 F.3d 843, 846 (6th Cir. 2012). The FLSA's overtime exemptions "'are to be narrowly construed against the employer seeking to assert them,'" and "[t]he employer bears the burden of establishing the affirmative defense by a preponderance of the evidence . . . by providing 'clear and affirmative evidence that the employee meets every requirement of an exemption.'" *Orton,* 668 F.3d at 846–47 (quoting *Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496, 501 (6th Cir. 2007)) (internal quotation marks omitted).

Here, Defendant argues Plaintiff was properly classified as a bona fide executive, and is therefore exempt from the FLSA's overtime provisions. (Doc. No. 13 at 1.) Pursuant to the relevant regulation, an "employee employed in a bona fide executive capacity" is defined as an employee:

> (1) Compensated on a salary basis at a rate not less than $455 per week . . . ;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (2014). An employee must meet all four of the above requirements in order to be considered an executive employee under the FLSA.

The parties agree that Plaintiff meets the first requirement to be considered a bona fide executive. (*See* Doc. Nos. 13 at 3; 19 at 13.) The Court thus addresses the last three requirements below.

A. *Management as a Primary Duty*

To meet this requirement, Defendant must show that Plaintiff's "principal, main, major or most important duty" is the "performance of exempt work," 29 C.F.R. § 541.700(a) (2014), which in this case is management,[2] *id.* § 541.100(a)(2). In assessing whether management is an employee's primary duty, the regulations contemplate four non-exhaustive factors:

> [T]he relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

---

[2] The regulations define management as including, but not limited to:
> [I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102.

*Id.* § 541.700(a). Courts are to assess the "totality of the circumstances" of the employment and the "'character of the employee's job as a whole'" in determining whether the employee's primary duty was management. *Roberts v. Dolgencorp, Inc.*, No. 2:09-0005, 2010 WL 4806792, at *6 (M.D. Tenn. Nov. 18, 2010) (quoting 29 C.F.R. 541.700(a)) (internal quotation marks omitted).

While an employee who spends more than 50 percent of her time performing management duties generally satisfies this requirement, the regulations do not require the employee to spend any specific portion of her time on exempt work to meet the primary duty requirement. *Id.* § 541.700(b); *see also Thomas*, 506 F.3d at 504 ("'Primary duty' does not mean the most time-consuming duty; it instead connotes the 'principal' or 'chief'—meaning the most important—duty performed by the employee."). The Sixth Circuit has recognized that the time factor can be "'somewhat misleading' where 'the employee's management and non-management functions are not clearly severable.'" *Id.* (quoting *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (6th Cir. 1982)).

Defendant argues that Plaintiff's primary duties included nearly all of the management functions listed in the regulations and that three of the four factors the Court considers weigh in favor of finding that Plaintiff's primary duties were managerial. (Doc. Nos. 13 at 3–13; 23 at 2–7.) Plaintiff responds that Defendant has not met its burden to prove the primary duty requirement because a disputed issue of fact exists as to whether Plaintiff's non-exempt duties were comparatively more important than her exempt duties based on the amount of time she spent performing each, her relative lack of freedom from direct supervision, the relationship between her salary and the wages of the tellers, and the alleged lack of a "customarily recognized department or subdivision" managed by Plaintiff. (Doc. Nos. 19 at 13–17; 29 at 1–3.)

The Court finds that, viewing the facts in the light most favorable to Plaintiff, she has failed to present a disputed issue of material fact as to whether her primary duty was management under the four factors of 29 C.F.R § 541.700(a). The Court analyzes these factors below in turn

### 1. Relative Importance of Plaintiff's Managerial and Non-Managerial Duties

Under this factor, the Court compares "the importance of the [employee]'s managerial duties with the importance of her non-managerial duties, keeping in mind the end goal of achieving the overall success of the company." *Thomas*, 506 F.3d at 505. The Court finds the evidence presented by both Plaintiff and Defendant clearly shows Plaintiff's managerial duties were more important to the success of the teller operations of the Nissan Drive branch than her non-managerial duties. The Court recognizes that Plaintiff's deposition testimony and declaration emphasize her lack of authority to manage the tellers or make "important decisions" such as hiring, firing, or other choices regarding corporate policy. However even taking Plaintiff's statements as true, the Court finds Plaintiff was undeniably tasked with managerial responsibilities essential to the day-to-day functioning of the Nissan Drive branch that often could only be performed by Plaintiff. Further, because the undisputed facts show there was always at least one teller in addition to Plaintiff working during the branch's business hours, the teller functions Plaintiff performed could have also been performed by another teller and were relatively less important than her managerial functions.

Plaintiff admits that she was responsible for interviewing applicants to fill positions at her branch after FTB's human resources department pre-screened them and that, while the branch manager would sit in on 70 percent of the interviews, she was the only person who participated in all of the interviews for positions at her branch during the relevant time period. (Doc. Nos.

9

13-2 at 56–57; 16 ¶15.) While Plaintiff tries to minimize this function by arguing that during the relevant period she participated in "fewer than 10 such interviews, each of which lasted less than an hour" (Doc. No. 16 at ¶ 15), she does not dispute that, whatever the number, she participated in *all* of the interviews conducted at her branch, including those of the two employees hired during the relevant time period. Simply because the branch only conducted an arguably small number of interviews during the time period at issue does not defeat the clear importance of Plaintiff's presence for every interview at the branch, especially in light of the fact that each recommendation Plaintiff made was followed by human resources. (Doc. No. 13-2 at 56, 72.)

Plaintiff also admits that she was responsible for attending monthly operations manager meetings in Nashville with operations managers from other branches and that a teller from her branch would only attend those meetings if she was unable to attend. (Doc. No. 13-2 at 97–99.) Plaintiff explained that she would then be responsible for disseminating the information she received at these meetings to the rest of the branch. (*Id.*)

Plaintiff testified that one of her responsibilities as an operations manager was to conduct observations of the tellers' customer interactions multiple times per quarter and grade each teller based on their customer service. (Doc. No. 17-1 at 9–10.) Plaintiff stated that she was also responsible for preparing the annual evaluations for the tellers, though she explained that the only part of the evaluation she had discretion over was the comments section. (Doc. No. 13-2 at 50–51.) After preparing the evaluations, Plaintiff testified that both she and the branch manager would review the evaluations with each teller. (*Id.* at 53.) While Plaintiff also received annual evaluations from the branch manager similar to the ones she prepared for the tellers, she testified that her scores were additionally based on the tellers' performance and the branch's overall audit

scores, whereas each of the tellers' scores was based solely on his or her own individual performance. (*Id.* at 37–40.)

Plaintiff testified that all of the employees at the branch were equally responsible for their performance on audits. However, she also explained that if the branch failed an audit, the operations manager was held responsible for the poor score. (*Id.* at 26–27.) In fact, when the Nissan Drive branch performed poorly on a follow-up audit in 2004, Plaintiff received a written warning[3] stating "you are expected to ensure each teller is retrained on additional teller duties as well as proper documentation on bank reports and other documents. . . . Cash advances are to be approved by yourself or the manager and proper documentation must be complete [sic] before advancing funds." (Doc. No. 13-2 at 136.) The written warning indicated that should the situation not improve, Plaintiff would be subject to further discipline up to and including termination.[4] (*Id.*)

Following a change in FTB policy in June 2012, Plaintiff and the branch manager were tasked with monitoring the tellers for balance issues with their cash and initiating documentation when tellers had significant balance discrepancies. (*Id.* at 99–100, 166.) Plaintiff testified that when a teller's end of day balance was off by over $100, a supervisor had to sign off on documentation of the balance discrepancy. (Doc. No. 17-1 at 34.) In at least one instance, Plaintiff signed off on this documentation for teller Crystal Quinn's $1,001 balance shortage in the "Supervisor Signature" field. (Doc. No. 13-2 at 170.)

Although Plaintiff testified that she and the tellers jointly determined their schedule and that only the branch manager had the final say on teller scheduling (Doc. No. 17-1 at 16), she

---

[3] Although the warning, styled as a memo is titled "verbal caution," the Court refers to it as a written warning given that it was, in fact, written and not verbal.

[4] The Court also notes that though Plaintiff stringently denies training or coaching the tellers, Plaintiff's annual operations manager evaluations make numerous references to her training and guiding the tellers (Doc. No. 13-2 at 101–04), indicating her branch managers seemed to think that she was involved in training the tellers.

also testified that, at one point, Harding took scheduling duties away from her[5] and had the operations manager at the Sam Ridley branch make the teller schedule for the Nissan Drive branch (Doc. No. 13-2 at 116–17). Thus, regardless of whether Plaintiff had the authority to personally resolve scheduling disputes, up to the point that Harding relieved her of the responsibility, Plaintiff was at least tasked with physically creating the schedule and forwarding it to Harding.

Significantly, Plaintiff and Harding both testified to the following facts regarding Harding's tenure as branch manager at the Nissan Drive branch: Harding was also the branch manager for another FTB branch, he did not have an office at the Nissan Drive branch, and he spent the majority of his time at the other branch. (Doc. Nos. 13-4 at 16; 18 ¶ 8; 25-4 at 4.) Thus, many of the duties that could have been carried out by either an operations manager or a branch manager would have fallen to Plaintiff the majority of the time as Harding was not there.

In short, Plaintiff was responsible for performing a number of managerial duties that were necessary for the daily operations of the Nissan Drive branch. While Plaintiff may have spent the vast majority of her time performing teller functions, because there was generally always at least one teller working with Plaintiff during business hours, had Plaintiff not been able to perform teller duties, the branch would have still functioned, albeit less efficiently. *See Thomas*, 506 F.3d at 505. By contrast if Plaintiff did not perform managerial tasks such as interviewing applicants, obtaining and disseminating FTB policy information and changes, evaluating teller performance, and monitoring and documenting balance issues, the branch would not function at all as no one else could carry out these essential tasks. *See id.*; *Roberts*, 2010 WL 4806792, at

---

[5] In her testimony, Plaintiff stated "he thought he was taking [scheduling duties] away from me. We kind of, I told you, did our own thing with the schedule so that we each knew what we were working." (Doc. No. 13-2 at 116.)

*7. As such, the Court finds this factor weighs in favor of Plaintiff's primary duty being management.

## 2. Relative Freedom From Supervision

Plaintiff argues that she was closely supervised by her branch manager and that she was not permitted to deviate from the strict policies and procedures set forth by FTB or make decisions about significant matters. (Doc. No. 19 at 15.) However, the only evidence Plaintiff cites for this argument is a paragraph from her declaration that mirrors the language in her argument without providing evidentiary support for its conclusion. (*See* Doc. No. 16 ¶ 11.)

"'[R]elative freedom from supervision' . . . does not demand complete freedom from supervision, such that [the employee] is answerable to no one." *Thomas*, 506 F.3d at 507. As the Court found above, Plaintiff's branch manager was often not at the Nissan Drive branch, leaving Plaintiff as the highest-ranking employee at the branch. Plaintiff also conducted a variety of tasks without oversight from the branch manager including teller observations (Doc. No. 17-1 at 9), some interviews (Doc. No. 13-2 at 56–57), and initiating documentation for teller balance issues leading to discipline (*id.* at 101–02). In addition, Plaintiff was responsible for disseminating information she received at operations manager meetings, which were not attended by branch managers. (*Id.* at 98–99.) Such undisputed facts indicate that Plaintiff did enjoy a certain amount of autonomy from her direct supervisor, and that, because she worked so frequently without a branch manager on site, she was relatively free from supervision. *See Little v. Belle Tire Distribs., Inc.*, No. 13-10311, 2013 WL 6328849, at *5 (E.D. Mich. Dec. 5, 2013) (finding the fact that the plaintiff worked without a store manager present for 22 percent of the time was "sufficient to demonstrate that management was his primary duty").

With regard to the FTB policies, the Court agrees with Defendant that simply showing that an employer has strict policies is not sufficient to conclude an employee is closely supervised. Following Plaintiff's argument, all employees of FTB, and all other highly regulated financial institutions for that matter, would be considered closely supervised. The Court would be hard-pressed to find such an interpretation of the Department of Labor's regulations properly supports Congress' intent in creating the executive exemption under the FLSA. Moreover, the supervision factor explicitly states the inquiry should focus on an employee's relative freedom from *direct supervision*, not rules and regulations. As such, Plaintiff's argument that the nature of FTB's policies rendered her subject to close supervision, even though she did not work with her direct supervisor the majority of the time, is unavailing. As such, the Court finds this factor weighs in favor of Defendant's primary duty argument.

### 3.  Relationship Between Plaintiff's Salary and Teller Wages

At the time of Plaintiff's termination she was earning $38,900 per year. Though it appears no records were kept showing how many hours per week Plaintiff worked, she stated that she worked at least 46.5 hours per week and sometimes over 50 hours per week. (Doc. No. 16 ¶ 33.) At 50 hours per week, Plaintiff's hourly wage would have been $14.96 and at 46.5 hours per week her hourly wage would have been $16.09. During the time period in question, Quinn made $13.90 per hour, Lisa Poteete made $11.87 per hour, Laura O'Neal made $12.00 per hour, and Antionette Mitchell made $11.09 per hour. (Doc. No. 13-5 ¶¶ 7–9.) Based on these numbers, Plaintiff's hourly rate would have only been eight to sixteen percent higher than the next highest paid teller, but would have been 35 to 45 percent higher than the lowest paid teller, depending on how many hours per week she worked. However, these numbers fail to take into account the fact that Plaintiff was eligible for, and received more than once, a quarterly bonus of

up to $2,000. (Doc. No. 13-2 at 18.) Therefore any quarter Plaintiff received a full bonus her hourly wage would have been $18.29 to $19.67 per hour. At this rate, Plaintiff would have been earning 32 to 42 percent more than the highest paid teller.

Although Plaintiff argues that tellers could earn as much as $18.00 per hour based on their seniority (Doc. No. 19 at 15), no proof in the record exists to support this statement other than Plaintiff's own declaration (Doc. No. 16 ¶ 12). Accordingly the Court finds this factor weighs in favor of Plaintiff's primary duty being management. *See Roberts*, 2010 WL 4806792, at *10 (holding an employee who's "hourly" salary was between 20 and 36 percent higher than the next highest paid hourly employee was significant enough for the factor to weigh in favor of the employee's primary duty to be managerial).

### 4. Amount of Time Spent Performing Exempt Work

While Plaintiff argues that she spent at least 95 percent of her time doing non-exempt work (Doc. No. 19 at 14), it is unclear to the Court how she arrived at this determination. Regardless, even assuming Plaintiff did spend the vast majority of her time doing non-exempt work, the Court finds the balance of the other factors weigh heavily in favor of finding Plaintiff's primary duty was management, and thus this factor is not determinative. *See* 29 C.F.R. § 541.700(b) ("Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."). Based on the balance of the factors, the Court finds Defendant has met its burden to show Plaintiff's primary duty as an operations manager was management.

### 5. Customarily Recognized Department or Subdivision

Plaintiff also argues that Defendant failed to present evidence that the tellers were a "department or subdivision" of the branch and that Defendant cannot show Plaintiff managed the

entire branch. (Doc. No. 19 at 15–16.) Plaintiff therefore concludes that even if her primary duty was management, she did not manage "the enterprise or a customarily recognized department or subdivision of the enterprise." (*Id.* at 16.) Defendant responds that Plaintiff did not manage the entire branch, but rather the branch's "Teller Operations." (Doc. Nos. 13 at 7; 23 at 7.)

To be a customarily recognized department or subdivision, it must have a "permanent status and a continuing function." 29 C.F.R. § 541.103(a). By contrast, "a mere collection of employees assigned from time to time to a specific job or series of jobs" is not a customarily recognized department or subdivision. *Id.* Here, the "Teller Operations" division of the branch appears from the record to be distinct from the "Financial Services" division of the branch. (*See* Doc. Nos. 13-2 at 39–40; 13-3 at 8; 13-4 at 8 25-2 at 2.) The tellers and Plaintiff worked at the teller windows performing simple financial transactions for customers whereas the financial services representatives ("FSR") worked on another side of the branch, performing functions such as opening accounts, selling investments, and issuing loans; additionally, the FSR position was not considered a "teller-type position." (Doc. No. 13-4.) The tellers and FSRs were clearly separate and distinct positions, and Plaintiff has not disputed that the branch employed both throughout her tenure with FTB. The Court thus finds the "Teller Operations" division was a permanent operation at the Nissan Drive branch with a continuing function that only included certain employees at the bank. Accordingly, Defendant has met its burden of showing Plaintiff's primary duty was management of a customarily recognized subdivision of the branch.

*B. Number of Employees Plaintiff Customarily and Regularly Supervised*

The next requirement for Plaintiff to be considered an exempt executive for purposes of the FLSA's overtime pay provisions is that she must "customarily and regularly direct the work

of two or more other employees," meaning "two full-time employees or their equivalent." 29 C.F.R. § 541.104(a) (2014). "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course may be less than constant." *Id.* § 541.701.

An employee will not meet this requirement if she "merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence." *Id.* § 541.104(c). However, here, the Court has determined that Plaintiff's primary duty was management of the "Teller Operations" division of the Nissan Drive branch, and that she performed multiple managerial functions independent of the branch manager. Thus the only factor at issue for determining whether Defendant has proven this requirement is whether Plaintiff "customarily and regularly" managed two or more employees.

The parties agree that between April 25, 2010, and March 19, 2013, there were usually two tellers working at the branch at any given time in addition to Plaintiff. (Doc. No. 24 ¶ 7.) Specifically, the tellers that worked at the branch during this time were Poteete, Quinn, O'Neal, and Mitchell, with Montrell Kilpatrick, a teller at the Sam Ridley branch, picking up shifts at the Nissan Drive branch on occasion. (Doc. Nos. 13-3 at 8; 13-4 at 50–51, 53.) From July 2010 through March 2011, three full-time tellers worked daily with Plaintiff; from March through August 2011, two full-time and one part-time teller worked daily with Plaintiff; and from August 2011 through January 2013, two full-time tellers worked daily with Plaintiff. (Doc. No. 24 ¶¶ 8–10.) Thus, during the entirety of the period at issue, at least two full-time tellers were employed at the Nissan Drive branch, and Plaintiff customarily and regularly directed the work of those tellers.

Plaintiff cites an Eleventh Circuit case for the proposition that because the tellers knew how to do their job, she did not need to direct their work. (Doc. No. 19 at 17.) However, in that

case, the court specifically found the plaintiff's non-management responsibilities were more important to the success of the store than his management responsibilities because his department was understaffed, causing the plaintiff to have to sacrifice performing his exempt duties of managing other employees in order to carry out non-exempt work. *Barreto v. David Marketplace, LLC*, 331 F. App'x 672, 675 (11th Cir. 2009).

Here, Plaintiff performed the duties of interviewing, conducting teller observations and evaluations, disseminating information regarding corporate policy changes and strategies to the tellers, initiating balance issue documentation, and reviewing disciplinary write-ups with tellers. Thus, unlike in *Barreto*, Plaintiff does not argue that she did not perform the managerial functions of her position because she was too busy performing non-exempt work, nor does she claim that because the tellers "knew their job" she did not need to provide them with additional information, such as comments on areas for improvement in evaluations or new information that came from corporate management. Further, some of Plaintiff's management duties, i.e. signing off on overages and handling wire transfers, could not be performed by the tellers such that, when no branch manager was present, Plaintiff was the only employee in the Teller Operations division of the branch that could perform these functions. If Plaintiff had not performed these duties, the daily operations of the branch could not be successful. Therefore, unlike the court in *Barreto*, the evidence here does not suggest Plaintiff's non-management responsibilities were more important to the branch's operation than her management duties.

Plaintiff also points out that in February 2013, Quinn was granted medical leave, leaving only one full-time teller working daily with Plaintiff. (*Id.* ¶ 11; Doc. Nos. 13-2 at 117; 13-4 at 50.) The Court first recognizes that, as the amount of time Quinn was on leave during the period

at issue was less than two months,[6] even a strict reading of the regulation does not foreclose the possibility that Plaintiff *customarily and regularly* directed the work of two or more other employees in the three year period at issue, notwithstanding Quinn's absence. Moreover, even when Quinn was on leave, she was still employed as a teller at the Nissan Drive branch and thus was still an employee under Plaintiff's direction. Quinn's medical leave near the end of Plaintiff's tenure at FTB does not affect the Court's finding that Plaintiff customarily and regularly directed the work of at least two employees between April 25, 2010, and March 19, 2013.

### C. *Authority to Hire or Fire and Weight Given to Plaintiff's Recommendations*

With respect to the fourth prong of the exemption, the regulations provide:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. . . . An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105. Examples of evidence that an employee's recommendations are accorded "particular weight" include: "witness testimony that recommendations were made and considered; the exempt employee's job description listing responsibilities in this area; the exempt employee's performance reviews documenting the employee's activities in this area; and other documents regarding promotions, demotions or other change of status that reveal the employee's

---

[6] The record reveals a dispute as to when Quinn's leave actually started. Plaintiff claims it began on February 1, 2013, while Harding testified that it was not approved until February 20, 2013. (Doc. Nos. 13-4 at 50; 16 ¶ 7.) For the purposes of this Order, the Court assumes Plaintiff's date of February 1, 2013, is when Quinn went on leave.

role in this area." Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,135 (Apr. 23, 2004).

Here, Plaintiff testified that as the operations manager, she was responsible for interviewing applicants—once they had been pre-screened by human resources—when the branch was seeking to add a new employee. (Doc. Nos. 13-2 at 3, 56, 59–60, 71–72; 16 ¶ 15.) During the relevant time period, two new tellers were hired at the Nissan Drive branch, one position was changed from full-time to part-time, and no one was fired. (Doc. Nos. 13-2 at 69– 70; 16 ¶ 14; 25-2 at 27.) As explained above, Plaintiff conducted all the interviews for the candidates for the two positions, of which she states the branch manager sat in on approximately 70 percent. (Doc. No. 13-2 at 69–70.) Plaintiff testified that after interviewing applicants, she and the branch manager would come up with a joint recommendation to human resources on which candidate to hire. (*Id.* at 60, 72.) For the two tellers hired during the relevant time period—O'Neal and Mitchell—Plaintiff testified that she and the branch manager jointly recommended they both be hired over the other candidates interviewed. (*Id.*) Plaintiff also testified that, when the Nissan Drive branch was required to reduce its teller staff from four full-time tellers to three full-time and one part-time, she and the branch manager jointly decided the teller to be affected should be the person with the least seniority. (*Id.* at 70.) The evidence in the record shows that Plaintiff actively participated in the staffing decisions at the Nissan Drive branch and that even if she did not have the independent authority to hire or fire any employees, her recommendations were given significant weight by human resources, who ultimately hired both of the applicants she recommended during the relevant time period. Accordingly, the Court

finds Defendant has met its burden to establish all four requirements to find that Plaintiff was an exempt employee under the FLSA for the purposes of overtime wages.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 12) is **GRANTED** and this case is **DISMISSED**.

It is so ORDERED.

Entered this $23$ day of May, 2014.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT